## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

MARISSA LAUREN PARKS,

**Plaintiff,**

-vs-                                                            Case No.  **6:15-cv-757-Orl-DAB**

COMMISSIONER OF SOCIAL
SECURITY,

**Defendant.**

_____

### MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED**.

## I.      BACKGROUND

### A.      Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on April 13, 2011, alleging an onset of disability on March 16, 2010, due to bipolar disorder, panic attacks with agoraphobia, shingles with postherpetic neuralgia, right shoulder damage with arthritis, right foot bone spur, left

knee arthritis with fluid, and heart murmur.  R. 320-30, 363.  Her application was denied initially and upon reconsideration.  R. 194-220.  Plaintiff requested a hearing[1], which was held on June 27, 2013, before Administrative Law Judge John D. Thompson, Jr. (hereinafter referred to as "ALJ").  R. 33-102.  In a decision dated July 19, 2013, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision.  R. 187.  Plaintiff timely filed a Request for Review of the ALJ's decision, which the Appeals Council denied on March 12, 2015.  R. 1-6.  Plaintiff filed this action for judicial review on May 12, 2015.  Doc. 1.

**B.      Medical History and Findings Summary**

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of bipolar disorder, panic attacks with agoraphobia, shingles with postherpetic neuralgia, right shoulder damage with arthritis, right foot bone spur, knee arthritis with fluid, and heart murmur.  R. 128.  After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from a history of bipolar disorder and "rule out posttraumatic stress disorder (PTSD)[2]," which were severe medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 175-76.  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform medium work, with specific exertional limitations, particularly a restriction to reaching overhead with the right upper extremity on an occasional basis, and a mental functional limitation to perform "simple rote and repetitive tasks in response to oral directives in a work environment in which there are no changes in tasks from one day to the next," no work in proximity to crowds and with any production goals or quotas, and no contact with the general public except she

---

[1]The request was dismissed by the ALJ, but the Appeals Council found that it was timely filed and remanded the claim back to ODAR.  R. 108-12, 103-07.

[2]This odd wording is in the original.  R. 175.

is able to interact occasionally with others such as co-workers and supervisors up to one-third of the day.  R. 180.

Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work.  R. 186.  Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform other work existing in significant numbers in the national economy.  R. 186-87.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 187-88.

Plaintiff now asserts three points of error.  First, she argues that the ALJ erred by mischaracterizing Plaintiff's severe mental impairments at Step 2 and improperly assessing the psychologist's opinions in formulating Plaintiff's RFC and in finding that she did not meet a listed impairment.  Second, she claims the ALJ erred in determining her physical RFC.  Third, Plaintiff contends the ALJ erred by finding she could perform other work in the national economy for representative occupations that have production goals or quotas even though the ALJ precluded such work in the RFC he assigned to Plaintiff.  Fourth, she asserts that the ALJ erred in evaluating her credibility.  For the reasons that follow, the decision of the Commissioner is  is **REVERSED** and **REMANDED.**

## II.    STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995)(*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### III.      ISSUES AND ANALYSIS

### A.      Evaluation of Plaintiff's mental limitations

Plaintiff argues that the ALJ erred in properly assessing her mental impairments. Doc. 16. Plaintiff argues that the ALJ mischaracterized her severe mental impairments at Step 2, and then erred by rejecting the testimony of Medical Expert Dr. Adam Cox, Ph.D., and discounting the conclusions of Consultative Examiner Dr. Danna Costa, Phy.D., to find that Plaintiff did not meet a Listed Impairment at Step 3 or have a RFC with mental limitations that precluded work at Step 5. The Commissioner argues that the ALJ properly gave Dr. Cox's opinions little weight and properly concluded Plaintiff's impairments singly or in combination did not meet or equal a Listing.

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments

which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

The listing of impairments in the Social Security Regulations identifies impairments which are considered severe enough to prevent a person from gainful activity. By meeting a listed impairment or otherwise establishing an equivalence, a Plaintiff is presumptively determined to be disabled regardless of his age, education, or work experience Thus, an ALJ's sequential evaluation of a claim ends if the claimant can establish the existence of a listed impairment. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984). However, at this stage of the evaluation process, the burden is on the plaintiff to prove that he or she is disabled. *Bell v. Bowen*, 796 F.2d 1350, 1352 (11th Cir. 1986); *Wilkinson v. Bowen*, 847 F.2d 660, 663 (11th Cir. 1987). In this circuit, a plaintiff must present specific findings that she meet the various tests listed under the applicable listing. *Bell*, 796 F.2d at 1353. Mere diagnosis of a listed impairment is not enough as the record must contain corroborative medical evidence supported by clinical and laboratory findings. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given

to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d).

The Regulations establish a "hierarchy" among medical opinions that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of nonexamining physicians, treating physicians' opinions are given more weight than non-treating physicians and the opinions of specialists are given more weight on issues within the area of expertise than those of nonspecialists." *McNamee v. Soc. Sec. Admin.*, 162 F. App'x 919, 923 (11th Cir. Jan. 31, 2006) (unpublished) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). Social Security Ruling 96-6p states that findings regarding the nature and severity of an impairment made by State agency consultants and other program physicians and psychologists "must be treated as expert opinion evidence of non-examining sources."

At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 16, 2010, the alleged onset date; Plaintiff's date of last insured is June 30, 2011. R. 175. At Step Two, the ALJ found that Plaintiff had the severe impairment of a history of bipolar disorder and "rule out PTSD." R. 175. At Step Three of the sequential evaluation process, the ALJ found Plaintiff did not have a listing-level mental impairment for Listing 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders), but she did have mild limitations of activities of daily living, moderate difficulties with social functioning, no difficulties with concentration, persistence or pace, and no episodes of decompensation of *extended* duration lasting at least two weeks. R. 177-79 (emphasis in the original).

The ALJ determined that Plaintiff had the following RFC:

[T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant is able to sit, stand and/or walk 6 hours each in an 8-hour workday, with reasonable and customary breaks. The claimant is able to lift and carry 50 pounds occasionally (up to 1/3rd of

the day) and 25 pounds or less frequently (up to 2/3rds of the day). The claimant has no limitations in pushing or pulling of arm, hand or foot/pedal controls. The claimant can climb ramps and stairs frequently; however, the claimant is unable to climb ropes, ladders and scaffolds. All other postural activities are available frequently. With regard to manipulative limitations, the claimant's only restriction is that she is only able to reach overhead with the right upper extremity on an occasional basis. In all other respects, she can reach in all other directions, handle, finger and feel without restrictions. There are no limitations with regard to the ability to see, hear aud speak. The claimant should avoid work at unprotected heights. The claimant is able to perform simple rote and repetitive tasks in response to oral directives in a work environment in which there are no changes in tasks from one day to the next; she should do no work in proximity to crowds; no work with any production goals or quotas; no contact with the general public; however, the claimant is able to interact occasionally with others such as co-workers and supervisors up to 1/3 of the day.

R. 180.  After the ALJ determined that Plaintiff could not perform her past relevant work, the ALJ asked the VE a hypothetical with the same RFC, and the VE testified that the person could perform the jobs of kitchen helper, cleaner, laundry sorter, and mail clerk.  R. 187.   Thus, the ALJ determined that Plaintiff was not disabled.  R. 187-88.

Plaintiff contends the ALJ erred in failing to adequately account for the significant ways that Plaintiff's severe mental health impairments impacted her functioning.  Plaintiff argues that, at Step 2 of the Sequential Evaluation Process, the ALJ mischaracterized her severe mental impairments and erroneously failed to find as "severe" several other impairments which substantial evidence supported as being severe.  She argues that she does not suffer from "*a history* of bipolar disorder and rule out PTSD," but from a *current*, active, severe bipolar disorder (R. 438, 445, 549, 562) which is supported by the record.  She contends that she also suffers from several other severe mental impairments–including Posttraumatic Stress Disorder (R. 562), Panic Disorder with Agoraphobia (R. 562, 445), Major Depressive Disorder, severe with psychosis (R. 549), Depressive Disorder (R. 503), Impulse Control Disorder (R. 549), Ataxia (R. 549), and Anxiety Disorder (R. 503)–and the ALJ's omission of these mental impairments resulted in erroneous determinations in Steps Three and Five, and in determining Plaintiff's RFC.

The Commissioner argues that the ALJ did not err at Step Two because Plaintiff failed to show she actually suffered from the additional severe mental impairments she alleges, and because the ALJ found Plaintiff had at least *one* severe impairment, *i.e.,* bipolar disorder, thus, the ALJ adequately considered her severe and non-severe impairments throughout his analysis of Plaintiff's claim, which is all he was required to do.  The Commissioner also contends that Plaintiff failed to address how any one of her alleged impairments significantly limited her ability to perform any of the listed physical or mental basic work activities.

Plaintiff testified at the hearing that she was accosted by gunmen (civilians) while serving in an Army Reserve unit in Guatemala in 2004 with the gunmen demanding her Army truck and gasoline and she received an honorable discharge from the Army Reserve in 2004.  She testified that she goes to the VA medical clinic every six months for medication management, and psychotropic medications have helped her mood.  However, she began hearing voices two to three years before the hearing in 2013, and she continues to hear voices in her head, telling her that she cannot trust others, and the auditory hallucinations "come and go."

The finding of any severe impairment, based on either a single impairment or a combination of impairments, is enough to satisfy step two because once the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe.  *Burgin v. Commissioner of Soc. Sec.*, 420 F. App'x 901, 902 (11th Cir. 2011) (unpublished disposition) (citing *Jamison v. Bowen*, 8 14 F.2d 585, 588 (11th Cir.1 987).  The ALJ must make specific and well-articulated findings as to the effect of the combination of all of the claimant's impairments. *Burgin*, 420 F. App'x at 902 (citing *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984)).  A clear statement that the ALJ considered the combination of impairments constitutes an adequate expression of such findings.  *Burgin*, 420 F. App'x at 902 (citing *Jones v. Dep't of Health & Human Servs.*, 94 1 F.2d 1529, 1533 (11th Cir. 1991)).  Here, the ALJ found

Plaintiff had a mental impairment, which he described as "bipolar disorder and rule out PTSD," which was enough to lead him to the next steps in the sequential evaluation.  Whether the ALJ adequately considered Plaintiff's "entire medical condition"–including any alleged impairments he found to be non-severe impairments along with her "history of bipolar"– at Steps 3 and 5 and in her RFC, is a separate issue addressed below.

Plaintiff contends that the ALJ erred at Step Three in completely rejecting the opinions of the medical expert, Dr. Cox, who opined Plaintiff met the Listing for 12.04 and/or 12.06, and the opinion of the most-recent consultative examiner, Dr. Costa, who opined that Plaintiff had numerous marked restrictions in mental functioning that would have satisfied the Listing-level criteria. The Commissioner argues that the ALJ properly gave Dr. Cox's opinions little weight and properly concluded Plaintiff's impairments "singly or in combination" did not meet or equal either Listing. "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citing 20 C.F.R. § 404.1525(a) (d)).

In order to meet either Listing 12.04 or Listing 12.06, a claimant must show that she satisfies the criteria in both Paragraphs A and B of those listings. 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06.  The A criteria consist of clinical findings which medically substantiate a mental disorder; which, in this case, the ALJ found Plaintiff met the A criteria.  R. 185.   Thus, the only issue is whether Plaintiff satisfies the B requirements.

To satisfy the B requirements of Listings 12.04 and 12.06, a claimant has to establish at least two of the following limitations: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *Id.*

Alternatively, under Listing 12.04 or 12.06, a claimant may satisfy the requirements of a listed mental impairment if she has a medically substantiated mental impairment and functional limitations that meet the "C" criteria of the listing. The "C" criteria for Listing 12.04 requires a medically documented history of a mental impairment and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease that has resulted in such marginal adjustment that even minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement with a need for such an arrangement to continue. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04. For listing 12.06, the "C" criteria is met if the mental impairment resulted in the "complete inability to function independently outside the area of one's home." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.06. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02 and § 11.03 (emphasis added).

Plaintiff argues that no less than three Social Security-hired consultative examiners and medical experts–who had either examined Plaintiff or examined the records as a whole–found mental restrictions in excess of that found by the ALJ, yet the ALJ erroneously discounted their opinions. Plaintiff points to the opinions of her mental impairments from these three psychologists– the Medical Expert, Adam Cox, Ph.D., and two Consultative Examiners, David Dietrich, Ph.D., and Danna Costa, Psy.D. She contends that each of these psychologists found her functional limitations to be greater than those found by the ALJ, yet each opinion was partially or wholly discounted by the ALJ on the grounds that they relied too heavily on Plaintiff's subjective reports, and that their opinions were not supported by the record as a whole. R. 177. The Commissioner argues that substantial evidence supports the ALJ's complete rejection of the opinion of the clinical psychologist, Dr. Cox, that Plaintiff had marked limitations in daily activities and social functioning because this conclusion was contradicted by other evidence in the record (R. 177). The Commissioner also contends that the mere

fact Plaintiff has been diagnosed with a mental disorder is insufficient to show that her impairment

was severe, without proof of a functional limitation imposed by the condition.

The ALJ summarized the Medical Expert Dr. Cox's testimony as:

Dr. Cox testified that the claimant has a long history of emotional instability marked by periods of agitation, hypomania, hypervigilance, depression and various kinds of panic symptoms. The independent psychological expert testified that there is indication that the claimant's emotional instability was evident in high school as she was suspended from school 10 times. He noted that the claimant has exhibited disrespectful behavior, difficulty coping with direction and authority and difficulty complying with rules and structure.

Dr. Cox further testified that Exhibit 1F indicates strong evidence of a serious emotional problem with symptoms of severe hypervigilance and paranoia. The independent psychological expert also noted that the claimant has chronic sleep problems.

In terms of the "paragraph B" criteria, Dr. Cox opined that the claimant has a "marked" restriction in activities of daily living. The reviewing psychologist noted that the claimant's ability to maintain personal safety is in question as she has experienced paranoia and suicidal ideation. However, Dr. Cox also acknowledged that the claimant is able to perform all basic activities of daily living, as noted in Exhibits 5F and 8F. Dr. Cox reasoned that the complexity of the claimant's functioning may not have been revealed in the consultative examinations, especially the examination with Dr. Dietrich.

At the hearing, Dr. Cox opined that the claimant has "marked" difficulties in social functioning. The expert witness noted that the claimant has paranoid thinking, as evidenced by caring a knife for protection. He also noted that the claimant was suspended in high school multiple times due to behavior problems. However, the doctor also noted that the claimant has related to coworkers reasonably well in the past.

Dr. Cox testified that the claimant does not have "marked" difficulties with concentration, persistence or pace. He noted that during periods of agitation the claimant would not be a good problem solver; she would have difficulty with sequential thinking and she would have difficulty relating cause and effect; however, the overall frequency of her mental status would not be of an extended duration to conclude that she has marked difficulties in that area.

Dr. Cox testified that the claimant has had one episode of decompensation, requiring hospitalization at the VA; however, there have been no repeated episodes of decompensation.

R. 176 -77.

The ALJ "completely rejected" Dr. Cox's opinion that Plaintiff met Listings 12.04 and 12.06 because, in the ALJ's opinion, Dr. Cox had "relied too heavily on the claimant's subjective report of her symptoms and limitations and ignored evidence to the contrary."  R. 177.  The ALJ rejected Dr. Cox's rating of Plaintiff's activities of daily living as "markedly" impaired because the ALJ found that "the evidence d[id] not support this conclusion based on the claimant's reported activities of daily living" in the consultative examination reports (Exhibits 5F and 8F).  The ALJ explained:

> The undersigned notes that the claimant has described daily activities that are not as limited as one would expect given her complaints of disabling symptoms and limitations. The undersigned further notes that the activities of daily living as described in Exhibit 8F are similar to the activities described in Exhibit 5F. This indicates that there has been consistency in the claimant's daily activities over time. What is more, the claimant's mental status examinations in these consultative examinations were relatively benign (Exhibits 5F and 8F). The mental status examination was normal as well in October 2012 (Exhibit 7F/16) and it appears as though the claimant was only seen on two occasions in 2012 for her mental health symptomatology (Exhibit 7F). Thus, the record reveals relatively infrequent trips to the doctor for the allegedly disabling mental health related symptoms.

> As noted above, the claimant has not generally received the type of psychological treatment one would expect for a disabled individual. For example, the claimant only presented to the Veterans Administration Medical Center in November 2011, May 2012 and October 2012 with  psychological complaints (Exhibits IF and 7F). In May 2012, the claimant reported, "I am anxious with racing thoughts" (Exhibit 7F/41); however, the claimant denied any depression and reported a decrease in her symptoms of mania (Exhibit 7F/34 and 7F/41). The claimant denied auditory or visual hallucinations (Exhibit 7F/42 and 7F/44). In October 2012, the claimant was described as pleasant, cooperative and well groomed. She maintained good eye contact throughout the examination. She denied suicidal ideation as well as auditory and visual hallucinations. The claimant's memory and concentration were intact (Exhibit 7F/16). The claimant noted that she is not on any psychotropic medications (Exhibit 7F/17). Thus, there is evidence that the claimant has not been entirely compliant in taking her prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application.

> The undersigned finds that the claimant has some "moderate" limitations in her social functioning in terms of working in proximity to crowds, no interacting with the general public and only occasionally with co-workers and supervisors and no need to meet any production quotas. However, the claimant has no difficulties with her attention and concentration based on the totality of the objective evidence and she can work doing unskilled and low level semiskilled work tasks.  The "paragraph B" criteria will be discussed in more detail below.

R. 177-78.

The ALJ similarly discounted the opinions of consultative psychologist examiners, Dr. Dietrich, from June 2011, and Dr. Costa, from February 2013. R. 183-85. The ALJ specifically gave Dr. Dietrich's opinion "some partial weight" to the extent it was consistent with the ALJ's assessed RFC, but gave it little weight as the additional restrictions opined by Dr. Dietrich were "not consistent with the credible medical evidence of record or supported by the record as a whole." R. 183. While the ALJ acknowledged that Plaintiff was "diagnosed with some anxiety and depression," he characterized her mental status exam as "fairly benign," her "attention and concentration were quite adequate," her activities of daily living were "not significantly limited and her overall social functioning was no more than moderately restricted." R. 183. The ALJ accorded "little weight" to the opinion of the second consultative examiner, Dr. Costa, who saw Plaintiff on February 13, 2013 and noted Plaintiff's reports of a history of childhood sexual and physical abuse as well as a traumatic event as an adult while in the military. R. 183. Dr. Costa noted Plaintiff's reports of irritable moods, a lack of trust, and her statement that "I always carry a knife around" because "I feel paranoid that someone is out to get me and I sometimes hear voices saying that." R. 183 (citing Exhibit 8F/2). Dr. Costa opined that the intensity of Plaintiff's symptoms overall were severe, but the ALJ found that Plaintiff's "presentation at this evaluation was significantly different and inconsistent in many respects to how she presented when seen by the prior psychological examiner." R. 183.

The ALJ pulled certain information from Dr. Costa's report that he used to support his findings:

> In the examination, the claimant reported that she lives with her best friend. As for activities of daily living, the claimant noted that she cleans the house and takes care of the animals. She is able to bathe and dress independently. The claimant is able to pay bills and care for the dogs and seven cats independently (Exhibit 8F).

> Dr. Costa noted that the claimant demonstrated adequate attention and concentration throughout the interview. Mental flexibility appeared adequate. There were no significant difficulties in processing speed. Receptive and expressive language

appeared adequate. Immediate memory appeared to be good and remote memory appeared to be adequate. The claimant demonstrated adequate mental computations and the claimant displayed adequate social skills as well (Exhibit 8F). Following the examination, the claimant's Axis I diagnoses included Bipolar II Disorder, Posttraumatic Stress Disorder, Panic Disorder with Agoraphobia. The claimant was assigned a GAF score of 50. In his report, Dr. Costa noted, "The mental health symptoms based on report and clinical observations appear to be severely impacting activities of daily living, vocational performance and interpersonal interactions" (Exhibit 8F/4). Such conclusions are clearly at odds with her own narrative report and mental status assessment.

In a Medical Source Statement, Dr. Costa opined that the claimant has a mild restriction in the ability to understand, remember and carry out simple instructions. However, the claimant has a marked restriction in the ability to make judgments on simple work-related decisions; understand, remember and carry out complex instructions and make judgments on complex work-related decisions. The claimant has moderate restriction in the ability to interact appropriately with the public, supervisors and co-workers. The claimant has a marked limitation in the ability to respond to usual work situations and to changes in a routine work setting (Exhibit 8F).

However, there is a rather substantial concern that Dr. Costa relied much too heavily on the claimant's subjective report of her symptoms and limitations, uncritically accepting as true most, if not all, of what the claimant reported. The medical evidence of record does not contain the type of significant clinical abnormalities one would expect if the claimant were as limited as alleged by this evaluator. Therefore, Dr. Costa's opinion is accorded little weight.

In the consultative examination with Dr. Costa, the claimant reported a long-standing history of severe depression; however, in Exhibit 5F/3 the claimant did not report a predominately depressed mood. What is more, the Mimi Mental State Examination (MMSE) offered by Dr. Dietrich elicited a score of 29/30, which is not indicative of any depression (Exhibit 5F). There is no evidence that the claimant received any mental health treatment between 2001 and 2010, aside from a prescription for Celexa in 2001(Exhibit 3F/2) and a letter submitted from Judy Rice, a family nurse practitioner, indicating that the claimant has been a client at the Community Health Center since 2006 for the treatment of Bipolar Disorder and Panic Disorder (Exhibit IF/11). There is evidence that she is medically non-compliant with taking her medications based on what she told Dr. Bear in Exhibit 7F/17.

Additionally, it is interesting that the claimant was inducted into the Army Reserve even though she claims to have suffered from such depression that she could not be deployed to Iraq. She was reportedly on Paxil, an anti-depressant. The undersigned notes that such depression would have disqualified her for military service. She saw the VA for a total of two to three appointments for mental health treatment (Exhibits 1F and 7F), which is not indicative of a severe impairment. On May 11, 2012, the claimant stated. "I am anxious, with racing thoughts" (Exhibit 7F/41); however, the claimant denied depression, stating, "I don't know if I have ever been depressed. Why am I on antidepressants?" (Exhibit 7F/4 1).

The claimant stated that she experienced a traumatic incident while on duty in Guatemala; however, she provides no evidence to substantiate this event. In addition, the claimant received no mental health treatment after this alleged incident occurred and she never applied for any service connected disability on this basis. The undersigned finds little evidence to support a diagnosis of PTSD, as the claimant's symptoms are inconsistently reported and her activities of daily living (as related to Dr. Dietrich and Dr. Costa) are not materially impacted. The mental status examination offered by Dr. Costa was not consistent with the symptoms that [s]he outlined for PTSD based on his [sic] own clinical observations-no hypervigilance, scanning or expectation or startle response. Likewise, the claimant expressed and demonstrated adequate social skills and behaviors during the examination. Her complaints of paranoia and psychotic symptoms are not supported by the overall record despite her allegations.

In offering a summary statement, Dr. Costa indicates that the claimant's reported symptoms severely impact her ability to work but this conclusion is simply inconsistent with the mental status examination and the other records in evidence. Dr. Costa has simply relied too heavily on the claimant's self-report rather than basing his assessment on the total records in evidence, including his own observations. Neither the mental status examination nor the one offered by the prior consulting psychologist support a conclusion that this claimant is disabled. Therefore, the undersigned gives only partial weight Dr. Costa's mental RFC statement. Based on the totality of the credible and objective evidence, the undersigned finds that the claimant may have a bipolar disorder; however, a diagnosis of PTSD is rejected as unsupported by the overall evidence. Using Listing 12.04, the undersigned concludes that the claimant meets the "A" criteria but has only "mild" limitation in daily activities, "moderate" limitation in social functioning and "mild" limitation in attention and concentration. The claimant has had no episodes of decompensation of extended duration.

R. 183-84.

In direct contradiction to the psychologists, the ALJ then summarized his own findings of Plaintiff's impairments based on his own review of the Record.  The ALJ determined Plaintiff had mild restrictions in daily living, because Plaintiff was capable of adaptive activities such as cleaning, doing yard work, pet care, paying bills, maintaining a residence, reading the news, caring appropriately for her grooming and hygiene and attending doctor appointments.  R. 178.  The ALJ determined Plaintiff had no difficulties in concentration, persistence or pace and she was "capable of sustaining focused attention and concentration sufficiently long enough to permit the timely and appropriated completion of tasks commonly found in most work settings. For example, the record indicates that the claimant has been able to support herself by buying and reselling items via the

internet." R. 179.  Social functioning was the only area in which the ALJ found Plaintiff would have moderate, but not marked, limitations because Plaintiff was capable of interacting appropriately and communicating effectively with other individuals, such as maintaining a long-term  friendship, socializing with family members, exhibiting cooperative behaviors with others as evidenced by her living situation, and interacting appropriately in the consultative examinations.  R. 178.  In the final mental functioning category, the ALJ  found that Plaintiff had experienced no episodes of decompensation of extended duration.  Thus, the ALJ found Plaintiff did not have two categories of marked restrictions and did not meet the Listings.

Based on a thorough review of the Record, including the testimony of Dr. Cox and the reports of the two psychological consultative examiners, the ALJ erroneously mischaracterized the psychologists' opinions and Plaintiff's testimony.

In the February 2013 consultative examination, Dr. Costa opined that Plaintiff appeared to meet the criteria for Bipolar II Disorder, Post Traumatic Stress Disorder, and Panic Disorder with Agoraphobia, based on a long history of mental health symptoms that have not alleviated since the onset, and noting that "the overall presentation appeared valid and consistent with the reported conditions." R. 562. Plaintiff reported to Dr. Costa having a trauma history remarkable for childhood sexual and physical abuse and also indicated experiencing a traumatic event as an adult while she was in the military, involving weapons while she was in Guatemala. R. 560.  Plaintiff also reported that she has gone to the ER due to "fear I was having a heart attack," and she always researches ways to escape places that she may have to go, including at the evaluation. R. 560.  Dr. Costa further opined that Plaintiff's mental health symptoms based on report and clinical observations appeared to be severely impacting her activities of daily living, vocational performance, and interpersonal interactions.  R. 562 (This report is also referred to "Exhibit 8F").  Dr. Costa opined that Plaintiff had a marked restrictions in the ability to make judgments on simple work-related decisions, understand,

remember and carry out complex instructions and make judgments on complex work-related decisions, and respond to usual work situations and to changes in a routine work setting; and a moderate restriction in the ability to interact appropriately with the public, supervisors and co-workers.  R. 564-65.  Her "mental health symptoms appear to have limited her ability to appropriately interact with others. She reported a willingness to go places with her best friend but nothing more; indicating that she carries a knife on her if she needs to go anywhere. In addition, she reported difficulties at home and work getting along with others, dealing with stressors and interacting with males."  R. 565.

At the prior consultative psychological examination signed by Dr. Dietrich and Wade Smith, M.S., conducted in June 2011, she reported having a difficult childhood with physical and sexual abuse, and being placed in a group home at 11 years old until age 18.  R. 498.  Dr. Dietrich opined that her childhood experiences may have contributed to her insecurity because she grew up feeling that no one really wanted her around, and when she mentions the incidents of molestation, her demeanor suggests that she may still be bothered by them. R. 500.  She graduated from high school at age 20, after repeating first and eleventh grades, and being suspended approximately ten times for fighting, truancy, and acting up in class.  R. 498.  Although she attended community college for two semesters in 2010, she withdrew because of social anxiety; she had not entered a store for the prior year because she felt anxious in public places.  R. 499-500.  Plaintiff reported having panic attacks, lasting one or two minutes and occurring once or twice a month for the last ten years, but she specifically denied that these were the focus of her social anxiety; she stated she felt more comfortable in the consultative evaluation than she typically did in doctors' offices, but Dr. Dietrich noted "she never appears relaxed here, and she often stares out the window." R. 500.  He also noted that she felt self-conscious in public places, suspicious that others are watching her and talking about her; she had

no friends and did not want any other than her roommate; she resented her coworkers at the potato chip plant for their idleness because she felt that she had to work harder because of it.  R. 500.

Plaintiff enlisted in the United States Army at age 27 and served three years of active duty; however, when her unit was about to be deployed to Iraq, she was informed that her use of Paxil made her ineligible to go and she received an honorable discharge.  R. 499.  Plaintiff had been treated from 2004 to June 2011 with psychotropics and monthly counseling appointments at the office of her primary care physician (in Tennessee, her former residence).  R. 299.  Dr. Dietrich opined that overall, she had a mix of anxiety symptoms and poor coping skills; the diagnostic impressions were of Anxiety Disorder Not Otherwise Specified and Depressive Disorder Not Otherwise Specified.  R. 500. He also opined that she was moderately impaired in her ability to interact with others in an appropriate manner because of her anxiety, and her impairment might be marked if she were required to work in a crowded, busy environment; her physical and psychological problems may detract from her ability to maintain attendance and meet an employment schedule.  R. 501.  In his opinion, Plaintiff "was not seen as exaggerating her symptoms for the purpose of gaining disability benefits."  R. 499 (This report is also referred to "Exhibit 5F").

After reviewing both psychological consultative examinations and the VA records, Dr. Cox testified at the hearing.  Dr. Cox described Plaintiff as "a person who has had a long history of emotional instability marked by periods of agitation, hypomania, hypervigilance, depression, various kinds of panic" and these disorders or this instability had been "diagnosed in several different ways over the course of the last few years."  R. 36.   Dr. Cox noted, based on his review of the medical records that Plaintiff was determined to meet the criteria or have the diagnosis of bipolar disorder, panic disorder, and post traumatic stress disorder.  R. 36.  His overall opinion was that Plaintiff met the Listing for 12.04 because there was evidence of meeting marked restrictions of activities of daily living and marked difficulties in maintaining social functioning, but not marked restrictions of

concentration, persistence or pace, and no pattern of repeated episodes of decompensation, only one episode of decompensation requiring hospitalization at the VA. R. 42. Dr. Cox opined that, in his opinion, "[t]he alleged onset date is really the question" because there was not the "degree of impairment that would lead to marked restriction, or marked difficulties as of March 16, 2010 (the alleged onset date), but it seemed to him that the records suggested November 2011 as when the marked or severe difficulties were occurring. R. 42.

Although Dr. Cox noted the evidence was complicated, he described the longitudinal picture of Plaintiff's life as demonstrating "very strong evidence of a serious emotional problem including, ten school suspensions, paranoia leading her to carry a knife to defend herself, a suicide attempt where she tried to hang herself, anxiety, depression, and an incident in the military where she was held at gunpoint. Dr. Cox discussed in great detail his reasoning for finding "marked" limitations in two of the four categories, citing to the two consultative examinations (Exhibits 5F and 8F), acknowledging that although there was some contradictory evidence, overall Plaintiff had problems with emotional stability:

> [W]hatever effect combat has had on this individual, and I'm not doubting that there has been an effect of combat, that this individual's problems with emotional stability proceeded her time in the military. She has a long history of having some disrespectful behavior, of having difficulty coping with direction and authority, is not a person who has easily found a way to comply with rules and structure, and this has caused her problems beginning at least in adolescence. The clinical records appear to become significant in 2010 . . . [in] the VA records . . . [which] appears to be very strong evidence of a serious emotional problem. There is a discussion of severe hypervigilance, there is discussion of paranoia to the extent the Claimant feels that others may be trying to hurt her, that she keeps a pocket knife with her so she can defend herself if she needs to. She has attempted suicide by trying to hang herself. She's having chronic sleep problems. It seems to be clear reading those notes that she is persistently during that period of time. . . . And we have also an indication there of an anxiety disorder and depressive disorder.
> * * *
> [Another] psychological examination in 8F [Dr. Dietrich] comes to the conclusion of a bipolar disorder. And so the discrepancy, or contradictory information in this case, is the acuity that is discussed in 1F [VA records] which kind of portrays a person with varied extreme problems remaining safe, and maintaining a sufficient reality orientation, being able to manage acute anxiety in a variety of situations. And then in

5F, we have a CE which describes the Claimant as having some problems with anxiety and depression, but the examiner does not note the presence of any of those symptoms during the course of the evaluation and is, in fact, somewhat routine in describing her capacity for ADL's, her capacity for social function and so forth, not really noting that there are any apparent difficulties revealed to him during the course of that evaluation.

I think that if we go to 5F, which is an evaluation [by Dr. Costa] that's done in February of this year, 2013, we get a somewhat different picture. And the picture that emerges in 5F is of a person who has had a history of serious emotional disregulation and does have some significant lability[3] with respect to social function and with respect to cognitive function as well. And I think that the completeness or the thoroughness of the history in 5F is certainly relevant to this case. I'm inclined to believe that the data in 8F [from 2013] are a more accurate reflection of the complexity and the depth of this individual's problems than the somewhat more superficial description of them that is in 5F [from 2011].

So I think that there is in the record sufficient information to say that the Claimant meets the A criteria for 12.04(a) (2), a manic syndrome characterized by at least three of the following. And we would say (a) hyperactivity, (b), pressure of speech, (c) flight of ideas, (e) there is decreased need for sleep, (f) easy distractability, and (h) [because] there is some evidence of paranoid thinking. So ample criteria in the record, particularly in the VA record [1F] and in the history provided in 8F to say that the Claimant meets the A criteria for 12.04.

If we go to the B criteria for 12.04, under (1) a marked restriction of activities of daily living. Well, I do not find in this record that there is any impairment in such basic things as toileting, or personal hygiene, or being able to, you know, feed yourself, or prepare a simple meal, procure food for yourself, etc. I think that this Claimant can generally accomplish those things. I don't doubt that she may be somewhat inconsistent with self care during times of more acute agitation, but I think it we understand that marked restriction of activities of daily living also includes the capacity to keep one's self safe from self harm, then I think we can say that this is an individual who has attempted suicide, and who has had suicidal thinking at other times as well.  That is not always the case. There are other VA records where the Claimant is frequently asked whether or not she is having suicidal thoughts, and she responds, no, that she is not. So, you know, my understanding from looking at the VA records is that there are times when either through medication, or through the consistency of treatment and counseling, and so forth, she's able to maintain safety, to contract for safety. But there are times when she is, has not been able to do that. And if we, if we consider the severity of those times and, and the high degree of (INAUDIBLE) that is described in the VA records at that time, I think we would say that there is a marked restriction of activities of daily living at least through that period of time in 2011.

---

[3]Although the transcript said "liability," the Court assumes the psychologist was discussing "lability" which, in psychiatric terms, refers to "emotional instability" or "rapidly changing emotions." *See* medical-dictionary.thefreedictionary.com/lability (visited on August 1, 2016).

Marked difficulties in social functioning. Here I think we can say that there are marked difficulties because certainly during that 2011 period there is evidence of marked difficulties in social functioning. The Claimant is having ideas of reference about other people, feeling as though she needs to carry a knife to protect herself from other people, it does not seem to me reasonable to conclude that she is able to effectively relate to any other people during this particular time. However, she has a history reportedly, at least in 5F, of being able to relate to some coworkers reasonably well in the past. And there is some further evidence in other VA records that some of this agitation that she has toward other people has subsided to a degree and so she is better able to relate to other people. My general sense here, Your Honor, is that this is an individual beginning at least in adolescence as evidenced by ten school suspensions that were related to disrespectful, noncompliant, no authority issue type behavior, that this is a person who has marked difficulties in social functioning.

R. 39-41. When the ALJ specifically questioned Dr. Cox about his opinion on Plaintiff's activities of daily living as represented in Dr. Dietrich's evaluation (5F), Dr. Cox responded:

[F]or ten years as a person who myself has conducted, you know, at least 500 consultative examinations, that it is not, that a Claimant's behavior in a consultative exam is often quite different from their longitudinal behavior across time. And so, particularly for people with a bipolar disorder who may vary in the acuity from one day to the next, the day that they come in for a consultative exam, they may be in one state that does not really reveal the complexity of their difficulty functioning on other particular days. . . . [T]his is a person whose psychosocial functioning has varied considerably from . . . one day to the next . . . [and] my sense of this particular document in 5F is that there was some lack of appreciation of the severity of the Claimant's history, that it's not captured in this particular evaluation. It's better captured in 8F. I thought overall 8F was a more detailed evaluation and was a more balanced evaluation with respect to the Claimant's difficulties, and the kind of implications of those difficulties over time. So, you know, but, but there's no question that as they're kind of described here in 5F, they do not appear to meet what we would say would be a marked restriction.

R. 46. When the ALJ asked Dr. Cox to reconcile the list of daily activities in 8F with a "marked" restriction, Dr. Cox explained:

[I]f you recall what I said when I said I reviewed the marked restrictions with daily living is that I agreed with both of these assessments that this Claimant does not have any trouble with self care, toileting herself, feeding herself, procuring food, personal hygiene. I said that in my testimony that I didn't see any problems with that. But that if we include marked restriction of activities of daily living as is typically the case in my experience doing these hearings, to include the ability to maintain personal safety, there is this history of suicide attempts, . . . and paranoia, and carrying a knife to defend herself against others, which seems to me to suggest that this is a person who at least at some period in the record, not consistently throughout the record, but at some period in the record has not been able to guarantee her own personal safety.

R. 48.  Although the ALJ mentions this portion of Dr. Cox's testimony in passing, he does not discuss it, or explain why he rejects it in favor of his own determination that Plaintiff can perform her daily activities, even if "she cannot guarantee her personal safety."

The ALJ's decision regarding Plaintiff's credibility is not based on substantial evidence.  In making a credibility determination, the ALJ appears to have penalized Plaintiff for substance abuse without directly addressing whether it would be disqualifying under the Social Security Regulations[4]. The ALJ noted in the decision "In terms of the claimant's substance abuse, the claimant testified that she quit using marijuana when she received her medication. The claimant noted that she would smoke marijuana twice per day. The claimant testified that the marijuana would keep her calm and help with the voices. The claimant testified that she last used marijuana last year." R. 181.  The ALJ asked Dr. Cox about the impact of substance abuse on "a legitimate bipolar disorder," to which Dr. Cox responded that, the consultative examination report[5], there was not a recent history of substance abuse, and Plaintiff last used cocaine and methamphetamine in high school and in the late 1990s.  R. 48-49. Reading from the report, the ALJ asked Dr. Cox about marijuana use "from 12 years old off and on until sometime last year, I guess meaning 2012."  R. 49.  When the ALJ asked how "the use of marijuana [would] impact a person with an underlying affective mood disorder or a bipolar disorder?" Dr. Cox testified:

> It would typically make them more relaxed. The people who use marijuana with bipolar disorder almost always do so as a form of self medicating and they are, unfortunately, using it instead of a psychiatric medication. But typically use, especially a person with, with this history, would, I would expect to use it as a, as an aid to be able to sleep. . . . When a person is prescribed, you know, appropriate and effective psychiatric medications often they don't feel the need to use the marijuana any longer

---

[4]In 1996, Congress amended the statutory definition of disability under the Social Security Act to preclude the award of benefits when alcoholism or drug addiction is determined to be a contributing factor material to the determination that a claimant is disabled.  *See* Pub.L.No. 104-121 § 105; 42 U.S.C. § 423(d)(2).  The regulations thereunder describe how to determine whether the claimant's drug addiction or alcoholism is a contributing factor material to the determination of disability. *See* 20 C.F.R. § 416.935(b).

[5]The ALJ was reading from Exhibit 8F at page 3. R. 48.

because they're, they're sufficiently stabilized and they can sleep and so forth. And so there isn't a pressing need. . . . [B]ut based on my clinical experience in these cases, I would say that probably this person was using it as a means of self medication.

R. 49-50.  The ALJ also discounted Plaintiff's credibility because he found that Plaintiff had received no mental health treatment for PTSD following the "Guatemalan incident."  R. 181.   The ALJ is incorrect that Plaintiff had not sought mental health treatment upon leaving the military after 2003. A letter from a Nurse Practitioner (Judy Rice) at Community Health Center states on September 29, 2010 that Plaintiff had been a client of the clinic since 2006, receiving treatment for Type II Bipolar Disorder and Panic Disorder with Agoraphobia, which she reported began in 2002 (while she would have been in the military[6]). "Despite trials of several different medications, she continues to experience significant symptoms which have prevented her from maintaining employment. Her disease has significantly impaired her activities of daily living" R. 445.  In November 2011, Plaintiff reported to the VA she was that held at gunpoint by several people in Guatemala while driving, and was experiencing PTSD and frequent panic attacks.  R. 442.

The ALJ also discounted Plaintiff's credibility apparently based on some unspecified knowledge of military guidelines not present in the Record or referred to in his decision, discounting Plaintiff's statements because she had been given "an honorable discharge as opposed to a medical discharge." R. 181.  The ALJ also questioned Plaintiff's representation that  "she was inducted into the Army Reserve even though she claims to have suffered from such depression that she could not be deployed to Iraq. She was reportedly on Paxil, an anti-depressant. The undersigned [ALJ] notes that such depression would have disqualified her for military service."  R. 184.  The Court is unable to assess the validity of the ALJ's  reasoning or application of military jurisprudence without citation to some authority.

---

[6]Plaintiff was born in 1973 and entered the miliary in 2000 when she was 27 years old; she served for three years of active duty; she was discharged in 2004.  R. 70-73.

The ALJ's other reason for discounting Plaintiff's credibility was because she had not received or applied for a service connected disability rating for mental illness from the VA. R. 181, 184. The ALJ is incorrect. Plaintiff testified that she was receiving disability from the VA for a shoulder injury–which is supported in the VA records (R. 442)– and she had applied for a disability rating from the VA for mental illness. R. 85. As such, the ALJ's credibility determination is not based on substantial evidence.

### B. VA rating

The Commissioner concedes that "the ALJ did not explicitly discuss Plaintiff's testimony regarding her alleged VA disability rating," but argues that the ALJ was not required to refer specifically to every piece of evidence in his decision, and the disability rating was not reflected in the medical record. Doc. 19 at 8 (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). The Commissioner is incorrect because the VA rating is in the VA's medical records (R. 442-"traumatic arthritis 10%"), and the ALJ clearly erred in not discussing the VA rating.

Although the SSA regulations provide that a disability determination by another agency is not binding on the Social Security Administration (20 C.F.R. § 404.1504), the Eleventh Circuit's case law is clear that "[a]lthough the V.A.'s disability rating is not binding on the Secretary of Health and Human Services, it is evidence that should be given great weight." *Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984) (citing *Olson v. Schweiker*, 663 F.2d 593 (5th Cir. 1981) and *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981)); *Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1303 (M.D. Fla. 2002) (noting that the ALJ's decision failed to indicate whether he accorded any weight to the VA's disability rating). When an ALJ rejects the VA's findings, the ALJ should state the reasons for doing so in order to allow a reasoned review by the courts. *Morrison v. Apfel*, 146 F.3d 625, 628, (8th Cir. 1998) (citing Mem., Soc. Sec. Admin. Office of Hearings and Appeals 3 (Oct. 2, 1992)). In a case where the ALJ rejected a plaintiff's disability rating because the VA disability criteria differ from

the Commissioner's, this Court held that the ALJ erred in failing to accord the VA's rating great weight as required by case law, and remand would be warranted for application of the proper legal standard. *Hogard v. Sullivan*, 733 F.Supp. 1465, 1469 (M.D. Fla. 1990) (reversed and remanded for award of benefits on other issues). Here, the ALJ's did not discuss the VA rating, or offer any explanation why he rejected it as evidence of Plaintiff's disability.

The Supreme Court has said, "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits and the Council's review is similarly broad." *Sims v. Apfel,* 530 U.S. 103, 111 (2000) (citation omitted). Where there are references in the medical records to a VA disability finding, the ALJ has the duty to develop the record relating to the other agency's disability findings. *See Baca v. Department of Health & Human Servs.,* 5 F.3d 476, 479-80 (10th Cir. 1993). Even though the Social Security claimant has the burden of providing medical evidence establishing disability, "the ALJ has a basic duty of inquiry to fully and fairly develop the record as to material issues;" this duty exists even when the claimant is represented by counsel. *Id.* In *Baca,* the plaintiff had received a 50% disability rating from the VA based upon ear and joint disease, and he made an application to the SSA for disability benefits based upon arthritis and heart disease. *Id.* at 478. The VA had been evaluating the plaintiff for disability for many years before the expiration of his insured status, and although later records were provided, the plaintiff's VA records for the relevant period were not available at the hearing before the ALJ. *Id.* at 480. The appellate court remanded the case, ordering the Commissioner to make every reasonable effort to obtain the VA records and to consider the VA disability rating for the relevant period. *Id.*

The case of *Weers v. Barnhart*, 2002 WL 69512, *2 (D. Kan. Jan. 15, 2002), is directly on point. In *Weers*, the only evidence of the plaintiff's VA disability rating before the ALJ was plaintiff's own testimony that he had received a 100% disability rating from the VA and was receiving

benefits. *Id.* In the disability decision in *Weers*, the ALJ made no reference to the VA disability rating other than plaintiff's testimony but did not discuss what weight or consideration, if any, he gave to such evidence. *Id.* at *4. As in this case, the ALJ did not have any of the findings or evaluations upon which the VA based its rating and the only VA records considered by the ALJ were medical treatment records like those of other health care providers that did not provide a disability rating or disability evaluation. *Id.* at *5. As such, it should have been obvious to the ALJ that the relevant VA records were missing from the record; because the ALJ was aware that the plaintiff claimed a 100% VA disability rating yet failed to obtain the missing VA records, the district court remanded the case for the ALJ to obtain the relevant VA disability records. *Id.* at *6.

Similarly, in this case, although Plaintiff testified that she was receiving a ten percent disability rating, service connected, for her shoulder and she had applied for disability based on mental illness (R. 65, 85), the ALJ not only failed to note the shoulder VA disability, but omitted any mention of Plaintiff's application for a mental illness rating. The ALJ also failed to make any provision for obtaining the VA records supporting the disability rating. Accordingly, the ALJ's decision is not consistent with the requirements of law and is not supported by substantial evidence. On remand, the ALJ will procure (directly or through counsel) Plaintiff's VA disability rating.

### C. Other issues

Plaintiff raises additional issues with the ALJ's credibility determination as to her pain from multiple spine injuries, shoulder injuries, shingles/right-side nerve damage, hip problems and right hand injuries as severe impairments. Doc. 16. Plaintiff also contends that the ALJ did not properly assess the AMA impairment assessment by the treating neurologist, Dr. John Ortolani, MD, who concluded that Plaintiff had an 11% whole body impairment related to a 2011 car accident. R. 176. MRIs showed an annular tear at T2-3 in the thoracic spine and straightening consistent with muscle spasms in the lumbar spine, and an electromyogram indicating lumbar radiculopathy at L5-S1. R.

175-76.  Plaintiff testified to a service-connected shoulder injury that prohibited her from lifting her arm over her head and causes pain, for which she takes Diclofenac, and to nerve damage from shingles on her ride side and hip, for which she takes the prescribed medication of Gabapentin; she also testified that she injured her spine in 2011 and continues to have chronic back pain.  R. 86,  87.  Plaintiff also argues the ALJ erred in assessing her credibility to the extent she failed to obtain treatment without adequately considering her explanations for any lack of treatment.  She cites SSR 96-7p which provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment" without first considering the evidence of record which may explain "infrequent or irregular medical visits or failure to seek medical treatment."  The Ruling further states that the "adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner."

Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560 (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).  Plaintiff additionally cites SSR 06-03p for the proposition that "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered . . . the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases."

On remand, the ALJ will hold a new hearing and assess Plaintiff's credibility consistent with the Eleventh Circuit case law and the applicable Social Security Regulations.  If the ALJ discounts the AMA rating, then he will explain his reasoning.

Lastly, Plaintiff contends that the ALJ erred by finding that Plaintiff could perform representative occupations that have production goals or quotas, even though the assigned RFC precluded work with goals or quotas, and by failing to resolve the related conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT").  Plaintiff argues that the ALJ found at Step Five that Plaintiff could perform other work in the national economy that appear, based on their DOT descriptions, to require production goals or quotas including kitchen helper (DOT #: 318.687-010), cleaner (DOT # 381.687-010), laundry sorter (DOT t #: 361.687-014), and mail clerk (DOT # 209.687-026).  At the least, Plaintiff argues, the DOT is ambiguous on this point and VE

testimony on it was required, but the VE's testimony did not address this point.  On remand, the ALJ will resolve the conflict (if any) between the VE's testimony and the DOT.

## IV.    CONCLUSION

For the reasons set forth above, the ALJ's decision is not supported by substantial evidence. Accordingly, it is **ORDERED** that the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g), is **REVERSED** and **REMANDED**.  The Clerk of the Court is **DIRECTED** to enter judgment, and, thereafter, close the file.

**DONE and ORDERED** on August 5, 2016.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE